FILED
19-0077
6/12/2020 3:25 PM
tex-43710781
SUPREME COURT OF TEXAS
BLAKE A. HAWTHORNE, CLERK

# IN THE SUPREME COURT OF TEXAS

=========
No. 19-0077
=========

ANTHONY A. RIEDER, ED RAPEE, III, AND
CADBURY SOLUTIONS, LLC, PETITIONERS,

v.

KENNY WOODS, ALAN MEEKER,
AND CQUENTIA SERIES, LLC, RESPONDENTS

============================
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE SECOND DISTRICT
============================

**Argued January 28, 2020**

JUSTICE GUZMAN delivered the opinion of the Court.

This appeal from the denial of a special appearance presents a familiar issue with a new wrinkle. Personal jurisdiction over two nonresident individuals and a nonresident limited liability company (LLC) is premised on a forum-selection clause in a contract the nonresident LLC executed with a Texas LLC. The rub is that neither the individual defendants nor the individual plaintiffs signed that contract. The two LLCs—one a plaintiff and one a defendant—are the only signatories, and they have not asserted any claims against one another. In short, a signatory LLC seeks to enforce the clause against nonsignatory individuals, and nonsignatory individuals seek to enforce the clause against nonsignatory individuals and a signatory LLC.

The trial court's ruling on the defendants' consolidated special appearance resulted in a split decision: the Texas LLC and its nonsignatory CEO (in his individual capacity) could enforce the forum-selection clause against the nonresident defendants, but the other nonsignatory plaintiff (a member of the nonresident LLC) could not. On cross-appeals, the court of appeals reversed in part and affirmed in part, holding all defendants are amenable to suit in Texas regardless of status as a contract signatory.[1] To reach that conclusion, the court determined the contract that includes the forum-selection clause must be construed in tandem with a contract that does not because the two instruments were part of the "same transaction."[2] After treating the documents as an indivisible unit, the court concluded the plaintiffs can enforce the forum-selection clause against the defendants as "transaction participants."[3]

We reverse the court of appeals' judgment and remand the cause to that court for further proceedings. Applying "common principles of contract and agency law and the parties' chosen language" as "the fulcrum of our inquiry,"[4] we hold that (1) under the circumstances presented, the separately executed instruments are not part of "a single, unified instrument"[5] and must therefore be construed separately and (2) the "transaction participant" enforcement theory is inapplicable.

---

[1] 587 S.W.3d 32 (Tex. App.—Fort Worth 2018).

[2] *Id.* at 46.

[3] *Id*.

[4] *Pinto Tech. Ventures, L.P. v. Sheldon*, 526 S.W.3d 428, 432 (Tex. 2017).

[5] *See Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000) ("In appropriate instances, courts may construe all the documents [in the same transaction] as if they were part of a single, unified instrument.").

2

## I. Background

Two business entities executed a contract for the purpose of selling healthcare services and products. When the deal soured, one company hired a principal away from the other company and purported to withdraw from the contract. The propriety of these actions and the enforceability of a restrictive covenant precipitated competing lawsuits:[6] the departing principal instituted litigation in Texas against his company and its remaining principals, and they returned the favor by filing suit in Wisconsin. The hiring company and its CEO intervened in the Texas litigation, asserting myriad claims against the Wisconsin contingency. The dispute over the defendants' amenability to suit in Texas centers on who may enforce a forum-selection clause in the entities' contract and who the clause may be enforced against.

On one side of the contract is defendant Cadbury Solutions LLC, a Nevada business entity with its principal place of business in Wisconsin. Cadbury's only members are plaintiff Kenny Woods and defendants Anthony Rieder and Ed Rapee III, none of whom are Texas residents. Rieder and Rapee are domiciled in Wisconsin, while Woods is a Utah resident. On the other side of the contract is plaintiff-intervenor CQuentia Series LLC (CQuentia), a Texas entity headquartered in Fort Worth, Texas. Plaintiff-intervenor Alan Meeker, a Texas resident, serves as the manager and CEO of CQuentia.

Before Cadbury's formation, Woods, Rieder, and Rapee were acquaintances who had explored various business opportunities in the healthcare sector. In connection with those endeavors, Woods introduced Rieder and Rapee to Meeker, Woods's contact at CQuentia. CQuentia's primary

---

[6] The noncompete agreement's enforceability is disputed but not at issue on appeal.

3

business at the time was producing and selling genetic testing services to healthcare providers, and Rieder and Rapee touted their medical-industry contacts as a means of expanding CQuentia's business. At some point, the parties discussed the possibility of Woods, Rieder, and Rapee forming a separate business entity through which they would promote and sell CQuentia's services on a national level.

On February 1, 2016, Woods, Rieder, and Rapee formed Cadbury in connection with consummating a business relationship with CQuentia.[7] On the same day, Cadbury's founding members signed the Cadbury Operating Agreement (the Cadbury Agreement), which makes each member an equal one-third owner. The agreement also defines Cadbury's business structure, establishes Wisconsin as its principal place of business, and delineates the members' duties and obligations (including restraints on competition).

The parties dispute whether Cadbury was created for the sole purpose of doing business with CQuentia, but the Cadbury Agreement broadly states the company's purpose is "to exercise all powers which may be legally exercised by limited liability companies under the [Nevada LLC Act]." The agreement does not reference CQuentia, Meeker, or any business dealings among them. Nor does it contain a forum-selection clause. The agreement does, however, include a choice of law provision requiring construction and application of the contract under Nevada law.

---

[7] The Nevada Secretary of State recognized Cadbury as a legal entity, but the parties nonetheless dispute whether Cadbury was validly formed. Though disputed in the underlying litigation, this matter is not before us on appeal.

4

On the same day Cadbury was formed, the company executed a series agreement with CQuentia (the Series Agreement).[8] The agreement created a series LLC under Texas law with Cadbury and CQuentia as its initial members and Fort Worth, Texas as its principal place of business (Series LLC).[9] Woods signed the Series Agreement on Cadbury's behalf, and Meeker signed for CQuentia.

Unlike the Cadbury Agreement, the Series Agreement is specific in declaring its purpose as the sale and distribution of medical-related services:

> The object and purpose of, and the nature of the business to be conducted and promoted by, this Series is to engage in the sale and distribution of DNA testing services including but not limited to pharmacogenomic testing and respiratory pathogen panel testing . . . and related medication reconciliation technology and services and any lawful act or activity related thereto permitted by the Texas Limited Liability Company Act . . . .

And unlike the Cadbury Agreement, the Series Agreement requires application of Texas law and contains the following forum-selection clause:

> **GOVERNING LAW. . . . ANY CLAIMS OR CONTROVERSIES UNDER OR RELATED TO THIS AGREEMENT SHALL BE EXCLUSIVELY DETERMINED IN THE STATE AND/OR FEDERAL COURTS LOCATED IN TARRANT COUNTY, TEXAS, TO WHOSE JURISDICTION EACH PARTY IRREVOCABLY CONSENTS.**

None of the individual members of the two companies signed the Series Agreement in their individual capacities; neither Rieder nor Rapee signed the agreement in their official capacities; and the agreement does not refer to the Cadbury Agreement by name or any other designation.

---

[8] A limited liability company may, by agreement, "establish . . . one or more designated series of members, managers, membership interests, or assets that: (1) has separate rights, powers, or duties with respect to specified property or obligations of the limited liability company or profits and losses with specified property or obligations; or (2) has a separate business purpose or investment objective." TEX. BUS. ORGS. CODE § 101.601(a).

[9] *See id.* §§ 101.601–.662 (authorizing and regulating series limited liability companies).

5

With the ink barely dry on the Series Agreement, the relationship between Cadbury and CQuentia disintegrated, and in September 2016, the companies exchanged demand letters. CQuentia informed Cadbury that it was hiring Woods and cancelling the Series Agreement for a variety of reasons, including internal strife and dysfunction. In response, counsel representing Cadbury invoked the restrictive covenant in the Cadbury Agreement as a bar to Woods's employment with CQuentia and refuted CQuentia's claim that it was no longer bound to the Series Agreement. Cadbury's counsel also sent Woods a letter instructing him that personal employment with CQuentia and Meeker would violate his fiduciary and contractual duties under the Cadbury Agreement. But Woods, CQuentia, and Meeker took the position that Cadbury never became a viable entity, so neither the Series Agreement nor the restrictive covenants in the Cadbury Agreement are enforceable.

The dispute came to a head when Woods sued Rieder, Rapee, and Cadbury in Tarrant County, Texas, as specified in the Series Agreement. Woods sought a declaration that (1) Woods, Rieder, Rapee, and Cadbury have no legal obligations to one another; (2) Cadbury never became a viable legal entity; (3) the Series Agreement is invalid because Cadbury never had a board of directors to ratify it, as required by the Cadbury Agreement; and (4) Woods is not bound by the noncompete agreement in the Cadbury Agreement because it never became effective. Woods also asserted claims for tortious interference, fraud, and breach of contract against Rieder and Rapee.

A month later, Cadbury sued Woods and Meeker in Wisconsin.[10] Against Woods, Cadbury sought a declaration that Cadbury is a viable entity and the Cadbury Agreement is either valid and binding or Rieder, Rapee, and Woods created a general partnership by conduct. Cadbury also asserted that Woods (1) breached his fiduciary duties and covenants of good faith and fair dealing; (2) violated the Cadbury Agreement's restrictive covenants through his dealings with Meeker and CQuentia; and (3) usurped corporate opportunities by diverting business from the Series LLC to CQuentia. Cadbury further alleged that Meeker (1) tortiously interfered with Cadbury's prospective revenue contracts and (2) conspired with Woods to tortiously interfere with the Series Agreement by diverting business opportunities to CQuentia.

In the Texas suit, Cadbury, Rieder, and Rapee filed a consolidated special appearance challenging personal jurisdiction and, alternatively, a motion to dismiss for forum non conveniens, arguing jurisdiction was proper and more convenient in Wisconsin.

CQuentia and Meeker then intervened in the Texas suit. Meeker sought a declaratory judgment that (1) Meeker (and CQuentia) could lawfully use Woods's services without violating the Cadbury Agreement's non-compete clause and (2) as CQuentia's CEO, Meeker had the right to unilaterally terminate the Series Agreement. CQuentia also asserted fraud, fraudulent-inducement, and negligent-misrepresentation claims against Rieder and Rapee individually.

Rieder, Rapee, and Cadbury responded to the plea in intervention by supplementing their special appearances to include CQuentia's and Meeker's claims. After a contentious hearing at

_____

[10] The Wisconsin suit was filed in Cadbury's name, but the complaint lists Rieder and Rapee as interested parties. The Wisconsin suit has been dismissed without prejudice pending resolution of the personal-jurisdiction issue in the Texas litigation.

7

which the plaintiffs assailed the special appearance on numerous grounds, the trial court found personal jurisdiction lacking as to Woods's claims against Cadbury, Rieder, and Rapee, but denied the special appearance as to CQuentia's and Meeker's claims. In doing so, the trial court found that CQuentia's and Meeker's (but not Woods's) claims against the defendants were encompassed by the Series Agreement's forum-selection clause, so litigation of those claims was mandatory in Tarrant County.

The court of appeals affirmed in part, reversed in part, and held the forum-selection clause bound all involved parties.[11] Specifically, the court reversed the portion of the trial court's order granting Cadbury, Rieder, and Rapee's special appearance as to Woods's claims and affirmed the portion denying the special appearance as to CQuentia and Meeker's claims.[12] The court began its analysis by noting that Cadbury admitted in the trial court and conceded on appeal that the Series Agreement's forum-selection clause would apply to any contract-related claims between Cadbury and CQuentia.[13] The court then concluded that all the claims were based on the same operative facts and all fell within the scope of the broadly worded clause.[14] The court summarily resolved Cadbury, Rieder, and Rapee's forum non-conveniens argument, concluding they failed to present evidence demonstrating Texas would be a "seriously inconvenient forum."[15]

---

[11] 587 S.W.3d 32, 37 (Tex. App.—Fort Worth 2018).

[12] *Id*. at 36-37.

[13] *Id.* at 39.

[14] *Id.* at 48-52.

[15] *Id.* at 40, 42-43.

8

Next, the court held that although only CQuentia and Cadbury signed the Series Agreement, CQuentia and nonsignatories Meeker and Woods could enforce the Series Agreement's forum-selection clause against nonsignatories Rieder and Rapee, compelling them to litigate in Texas.[16] To reach this conclusion, the court construed the Cadbury Agreement and the Series Agreement together as a single, unified instrument.[17] As for Woods's claims against Rieder and Rapee, the court noted that inclusion of a "Board Exculpation" clause in the Cadbury Agreement,[18] coupled with the broad wording in the Series Agreement's forum-selection clause, evidenced Woods, Rieder, and Rapee's intent to submit any disputes among the Cadbury members to a Texas forum.[19] The court further held that Woods could enforce the forum-selection clause against Rieder and Rapee as "transaction participants" even though they did not sign the Series Agreement.[20]

For Meeker and CQuentia's claims, the court invoked the "transaction participant" and "closely related to the contractual relationship" theories of enforcement.[21] The court concluded that

---

[16] *Id.* at 54-56.

[17] *Id.* at 47-48.

[18] The "Board Exculpation" clause in the Cadbury Agreement reads:

No Board Member, officer, or agent appointed by the Board, individually or severally, will be liable, responsible, or accountable in damages or otherwise to the Company or to any Member for any acts performed or omitted by him or her related to the Company, except: (i) for any breach of the Board Member's duty of loyalty to the Company or its Members; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) for breaches of this Agreement; or (iv) for any transaction from which the Board Member derived an improper personal benefit. Each of the persons referenced above in this section is an express third-party beneficiary of this section.

[19] *Id.* at 53-54.

[20] *Id.* at 54-55.

[21] *Id.* at 54-56.

9

Rieder and Rapee were bound by the forum-selection clause in the Series Agreement as participants to that transaction because (1) the Cadbury Agreement required Rieder, Rapee, and Woods to approve the Series Agreement before Woods could bind Cadbury; (2) Rieder and Rapee's representations to Meeker that they would use their medical-industry contacts to generate customers and sales resulted in the Series Agreement's execution; and (3) the parties' conduct surrounding Cadbury's formation and execution of the Cadbury Agreement indicated Cadbury was conceived for the sole purpose of entering the Series Agreement.[22] Based on these determinations, the court held that invocation of the forum-selection clause by Woods, Meeker, and CQuentia against Rieder and Rapee was foreseeable and would fulfill the parties' intent of having "any claims or controversies under or related" to the Series Agreement heard in Tarrant County.[23]

We granted the defendants' petition for review to determine whether the forum-selection clause can be enforced by signatory CQuentia and nonsignatories Woods and Meeker. In their petition, Cadbury, Rieder, and Rapee primarily argue the court of appeals erred by (1) expanding the transaction-participant theory to allow nonsignatories to enforce forum-selection clauses against other nonsignatories; (2) reading the separately executed Cadbury Agreement and Series Agreement as a unified instrument; and (3) failing to conduct a personal-jurisdiction analysis to determine whether Texas possesses general or specific personal jurisdiction over Cadbury, Rieder, and Rapee.

---

[22] *Id.* at 44, 56.

[23] *Id.* at 54, 56. Citing the overlapping nature of the transaction-participant and closely related enforcement theories, the court also held Meeker and CQuentia could enforce the forum-selection clause against Rieder and Rapee because their "conduct is closely related to, if not determinative of, the contractual relationship (if any) that exists between CQuentia and Cadbury via the CQuentia/Cadbury Series Agreement." *Id*. at 56.

10

## II. Discussion

### A. Forum-Selection Clauses

Contractual forum-selection clauses allow contracting parties to "preselect the jurisdiction for dispute resolution."[24] Although once disfavored, such clauses are presumptively valid,[25] and constitute consent to jurisdiction in the agreed forum.[26] Courts must enforce a valid forum-selection clause "unless the party opposing enforcement clearly shows '(1) enforcement would be unreasonable or unjust, (2) the clause is invalid for reasons of fraud or overreaching, (3) enforcement would contravene a strong public policy of the forum where the suit was brought, or (4) the selected forum would be seriously inconvenient for trial.'"[27] This is a heavy burden to overcome.[28]

In this case, the validity of the Series Agreement's forum-selection clause is not in dispute. Nor is there a dispute that any claims between Cadbury and CQuentia "under or related to" the Series Agreement would fall within the forum-selection clause's ambit. Instead, the issue we must resolve is two-fold: (1) whether nonsignatories Woods and Meeker can enforce the forum-selection clause against nonsignatories Rieder and Rapee and signatory Cadbury, and (2) whether signatory CQuentia can enforce the forum-selection clause against nonsignatories Rieder and Rapee.[29]

---

[24] *Pinto Tech. Ventures, L.P. v. Sheldon*, 526 S.W.3d 428, 436 (Tex. 2017).

[25] *In re Lyon Fin. Servs., Inc.*, 257 S.W.3d 228, 232 (Tex. 2008) (orig. proceeding).

[26] *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 792 (Tex. 2005); *see Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985) (personal jurisdiction may be waived).

[27] *In re Laibe Corp.*, 307 S.W.3d 314, 316 (Tex. 2010) (orig. proceeding) (quoting *In re ADM Investor Servs., Inc.*, 304 S.W.3d 371, 375 (Tex. 2010)).

[28] *Lyon Fin. Servs.*, 257 S.W.3d at 232.

[29] The parties concede that Cadbury and CQuentia were the only legal signatories to the Series Agreement due to Woods (Cadbury) and Meeker (CQuentia) signing the Series Agreement in their representative capacities.

To settle an enforcement dispute of this nature, we typically start with the contract's language. "Forum-selection clauses are creatures of contract,"[30] so the clause's language dictates its reach and determines whether the parties' claims fall within its scope.[31] But this case presents an unusual variation that requires us to first determine whether the Cadbury Agreement and the Series Agreement may be construed as one transaction, so that the forum-selection clause applies as if it were also part of the Cadbury Agreement.

## B. Two Separate Agreements or One Instrument?

Construction of a contract is a question of law we review *de novo*.[32] "[O]ur primary objective is to ascertain the parties' true intentions as expressed in the language they chose."[33] We construe a contract in a manner that gives "effect to the parties' intent expressed in the text," but we may also take into account "the facts and circumstances surrounding the contract's execution."[34] In that vein, Texas courts have long recognized that, under appropriate circumstances, "instruments pertaining to the same transaction may be read together to ascertain the parties' intent, even if the parties executed the instruments at different times and the instruments do not expressly refer to each other."[35] Where appropriate, "a court may determine, as a matter of law," that multiple separate

---

[30] *Pinto Tech. Ventures, L.P. v. Sheldon*, 526 S.W.3d 428, 443 (Tex. 2017).

[31] *Id.* at 436-37.

[32] *Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 7 (Tex. 2014).

[33] *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015).

[34] *Americo Life, Inc. v. Myer*, 440 S.W.3d 18, 22 (Tex. 2014).

[35] *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000) (citations omitted); *see Jones v. Kelley*, 614 S.W.2d 95, 98 (Tex. 1981) ("The general rule is that separate instruments or contracts executed at the same time, for the same purpose, and in the course of the same transaction are to be considered as one instrument, and are to be read and construed together."); *Veal v. Thomason*, 159 S.W.2d 472, 475 (Tex. 1942) ("It is the settled rule

12

contracts, documents, and agreements "were part of a single, unified instrument."[36] In determining whether multiple agreements are part and parcel of a unified instrument, a court may consider whether each written agreement and instrument was "a necessary part of the same transaction."[37] But when construing multiple documents together, courts must do so with caution, bearing in mind that tethering documents to each other is "simply a device for ascertaining and giving effect to the intention of the parties and cannot be applied arbitrarily and without regard to the realities of the situation."[38]

Plaintiffs Woods, Meeker, and CQuentia argue the court of appeals correctly concluded that the Cadbury Agreement and the Series Agreement were executed for a "unitary purpose" and should therefore be construed together. In support, they primarily point to the parties' conduct preceding the separate execution of those agreements but also emphasize the concurrency of the agreements' effective dates. Although the "purpose" statement in the Cadbury Agreement evidences the members' intent to engage in any lawful activity under Nevada law and does not cabin Cadbury's operations solely to transactions with CQuentia, the plaintiffs argue the "purpose" statement is not dispositive of whether the two agreements may be read together. Instead, they contend that, when examined as a whole, the "undisputed facts" and circumstances surrounding Cadbury's creation and

---

in this State, as well as the rule generally, that written contracts executed in different instruments whereby a single transaction or purpose is consummated are to be taken and construed together as one contract.").

[36] *Fort Worth Indep. Sch. Dist.*, 22 S.W.3d at 840.

[37] *Bd. of Ins. Comm'rs v. Great S. Life Ins. Co.*, 239 S.W.2d 803, 809 (Tex. 1951).

[38] *Miles v. Martin*, 321 S.W.2d 62, 65 (Tex. 1959).

13

execution of the Series Agreement prove that both occurred for the sole purpose of ratifying the Series Agreement.

Defendants Cadbury, Rieder, and Rapee counter that the express language of the two contracts make it clear that the contracts "involve and bind different parties, contain entirely separate and distinct rights and obligations, and make no reference to each other whatsoever." The defendants contend that, if the court of appeals had focused on the agreements' language to ascertain the parties' intent, the obvious and only conclusion is that the two agreements do not evidence one transaction and cannot be construed together.

After reviewing the language of both agreements and the facts and circumstances surrounding their execution, we hold that the Cadbury Agreement and the Series Agreement are not components of a single, unified instrument.

**1. Terms and Obligations of the Agreements**

The parties to the Cadbury Agreement are identified as Cadbury's members—Woods, Rieder, and Rapee—and no others. Likewise, the only signatories to the Cadbury Agreement are Woods, Rieder, and Rapee. The agreement states Cadbury "was formed as a Nevada limited liability company on February 1, 2016." And per the agreement's terms, Cadbury's purpose is to "exercise all powers which may be legally exercised by limited liability companies under" Nevada law. Noticeably absent from the Cadbury Agreement is any mention of CQuentia or the Series Agreement. Nor does the agreement contain any language stating or implying Cadbury was formed and the operating agreement was executed for the sole purpose of consummating the Series Agreement transaction.

14

The only parties to the Series Agreement are Cadbury and CQuentia. The agreement has an effective date of February 1, 2016 and states that it is by and between "CQuentia Series LLC, a Texas limited liability company" and "CADBURY SOLUTIONS, INC., a Nevada limited liability company," as the only two initial members. Importantly, all parties acknowledge that Cadbury and CQuentia are the only signatories to the Series Agreement. The Series Agreement provides a specific "object and purpose" and "nature of the business to be conducted by[] this Series," which differs from the Cadbury Agreement's purpose. Unlike the Cadbury Agreement, the Series LLC's purpose is "to engage in the sale and distribution of DNA testing services including but not limited to pharmacogenomic testing and respiratory pathogen panel testing . . . and related medication reconciliation technology and services" as well as "any lawful act or activity related thereto permitted by the Texas Limited Liability Company Act." Finally, the Series Agreement mentions Cadbury, but it does not refer to the Cadbury Agreement or incorporate any rights, duties, or obligations contained within the four corners of that agreement.

The Cadbury Agreement's plain language cannot reasonably be construed as supporting the conclusion that it was executed for the sole purpose of entering the Series Agreement with CQuentia. Instead, the Cadbury Agreement evidences Woods, Rieder, and Rapee's intent to form a broad-functioning limited liability company, while simultaneously laying out their responsibilities and obligations with respect to Cadbury and each other.

Similarly, based on the Series Agreement's plain language, we conclude the parties to that agreement, Cadbury and CQuentia, manifested an intent to create a series limited liability company, existing separate and apart from both Cadbury and CQuentia, that was formed for the express

15

purpose of engaging in the sale and distribution of medical-related services. Further supporting the conclusion that the two agreements are independent of one another is the inclusion of merger clauses in both agreements.

## 2. Merger Clauses

Both the Cadbury Agreement and the Series Agreement contain standard merger clauses. A merger clause is a "contractual provision stating that the contract represents the parties' complete and final agreement and supersedes all informal understandings and oral agreements relating to the subject matter of the contract."[39] The Cadbury Agreement states that it "contains the entire agreement among the parties hereto and supersedes any prior understandings or agreements among them respecting the subject matter thereof." Similarly, the Series Agreement states that it "constitutes the entire agreement of the Members with respect to the subject matter hereof and supersedes all prior agreements, express or implied, oral or written, with respect thereto."

In *Laibe Corp.*, we relied on a merger clause in a multiple-agreement transaction to enforce a forum-selection clause in one of the agreements.[40] The question presented was whether two separate documents, both related to the sale of a drilling rig, could be read together as a single contract, compelling enforcement of a forum-selection clause contained in only one of the documents.[41] Unlike the dispute at hand, the parties to the two agreements in *Laibe* were identical.[42] Ultimately, we read the two agreements together because both pertained to the same rig purchase,

---

[39] *Integration (Merger) Clause*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[40] *In re Laibe Corp.*, 307 S.W.3d 314, 317 (Tex. 2010) (orig. proceeding).

[41] *Id.* at 316.

[42] *Id*.

were executed by the same parties, and shared the same transaction date.[43] In addition to construing the two documents as one transaction, we held that inclusion of a merger clause in the purchase contract required enforcement of its forum-selection clause.[44] We reasoned that by including a merger clause, the parties intended for the purchase contract, not the invoice, to be their "final and binding agreement."[45]

Here, the existence of a merger clause in both the Cadbury Agreement and the Series Agreement confirms the agreements are separate and distinct from one another and the parties did not intend otherwise. Woods, Rieder, and Rapee's inclusion of a merger clause in the Cadbury Agreement binds the three to that agreement and makes that agreement's terms the final, binding, and superseding obligations each has agreed to undertake with respect to Cadbury.[46] The merger clause in the Series Agreement operates in a similar manner, making its terms final and superseding any and all prior agreements by and between Cadbury and CQuentia. And because the two agreements clearly impose distinct obligations with respect to separate subject matters and are subject to different governing laws, we conclude the merger clauses in both agreements support the separateness of the two instruments. Indeed, if we were to conclude otherwise, one or both of the merger clauses would be rendered a nullity because it is impossible for both contracts to be the "complete and final" or "entire" agreement, especially when all the parties are different.

---

[43] *Id*. at 316-17.

[44] *Id.* at 317.

[45] *Id*.

[46] *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co.*, 341 S.W.3d 323, 334 (Tex. 2011) (noting that the inclusion of a merger clause in a written contract "achieves the purpose of ensuring that the contract at issue invalidates or supersedes any previous agreements").

17

### 3. Parties' Intent in Creating Separate Entities

Finally, in ascertaining the parties' intent in executing the Cadbury and Series Agreements, we recognize a fundamental principle of corporate law: "an individual can incorporate a business and thereby normally shield himself from personal liability for the corporation's contractual obligations."[47] "Avoidance of personal liability is not only sanctioned by the law; it is an essential reason" why individuals choose to incorporate and form distinct legal entities prior to conducting business and agreeing to contractual obligations.[48] The entities involved in this dispute are either incorporated under the laws of this state or the state of Nevada, both of which extend personal-liability protection to managers and members of limited liability companies.[49]

After analyzing the circumstances surrounding the execution of both agreements,[50] we conclude that by creating two separate legal entities—Cadbury and the Cadbury/CQuentia Series LLC—the context further establishes the agreements were executed for separate and distinct purposes. For example, Woods, Rieder, and Rapee chose to form Cadbury, a limited liability company, before entering the Series Agreement with CQuentia. If Cadbury's members had intended to bind themselves to the Series Agreement as individuals, they could have done so without forming

---

[47] *Willis v. Donnelly*, 199 S.W.3d 262, 271 (Tex. 2006).

[48] *Id.*

[49] *See* TEX. BUS. ORGS. CODE § 101.114 ("Except as and to the extent the company agreement specifically provides otherwise, a member or manager is not liable for a debt, obligation, or liability of a limited liability company, including a debt, obligation, or liability under a judgment, decree, or order of a court."); *accord* NEV. REV. CIV. STAT. § 86.371 ("Unless otherwise provided in the articles of organization or an agreement signed by the member or manager to be charged, no member or manager of any limited-liability company formed under the laws of this State is individually liable for the debts or liabilities of the company.").

[50] *See Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981) ("Evidence of surrounding circumstances may be consulted."); *see also URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 765-69 (Tex. 2018) (explaining the role surrounding circumstances play in contract interpretation and the limits of this interpretive aid).

18

Cadbury. They did not do so. Moreover, neither Woods nor Meeker signed the Series Agreement as individuals; rather, both signed only in representative capacities.

In the final analysis, the parties' concerted efforts to limit their liability exposure through separately formed LLCs manifests an intent that Cadbury, CQuentia, and their members would remain distinct from one another in the eyes of the law. These liability-limiting measures would have been unnecessary if the parties had intended the two business-formation documents to be construed as a single transaction. Absent a textual basis to do so, we cannot read the contracts in a manner that ignores the well-established legal principle that limited liability companies and their obligations are legally distinct from their members and managers. Doing otherwise risks eroding the protection individuals gain by operating through a limited liability company.

### 4. Woods Cannot Enforce the Forum-Selection Clause Against Rieder and Rapee via the Cadbury Agreement's Board Exculpation Clause

Having held that the two agreements must be construed separately, we next address whether Woods can enforce the Series Agreement's forum-selection clause via the Cadbury Agreement's "board exculpation" clause.[51] The court of appeals held he could. First, the court concluded the language in the board exculpation clause constituted the Cadbury members' agreement to subject themselves to personal liability in some situations, including the claims Woods asserts here.[52] Then, based on the erroneous conclusion that the Cadbury and Series Agreements could be read together, the court determined Woods's claims against Rieder and Rapee fall within the scope of the

---

[51] *See supra* note 18.

[52] 587 S.W.3d 32, 53-54 (Tex. App.—Fort Worth 2018).

19

forum-selection clause.[53]  The court of appeals' holding that the forum-selection clause can be enforced rests on a faulty premise and fails because the two agreements cannot be construed as one instrument.  The board exculpation clause is part of the Cadbury Agreement, which is separate from and beyond the reach of the Series Agreement's forum-selection clause.  Woods therefore cannot enforce the forum-selection clause against Rieder and Rapee via that clause.

### C. "Transaction Participant" Enforcement Theory

We next address whether the forum-selection clause can be enforced against Cadbury, Rieder, and Rapee as "transaction participants" and parties who are "closely related to the contractual relationship."  Because of the overlap and similarity between the two enforcement theories, we refer to them collectively as the "transaction-participant theory" unless otherwise noted.[54]

In *Pinto Technology Ventures, L.P. v. Sheldon*, we observed that "courts have held that 'transaction participants' may enforce a valid forum-selection clause even if they are not actual signatories to the contract."[55]  The rationale favoring a nonsignatory's enforcement of a forum-selection clause against a signatory is rooted in foreseeability.[56]  That is, when a signatory has

---

[53] *Id.* at 54.  Because we conclude the two agreements cannot be read together, we need not decide if the court of appeals correctly determined that Woods's claims were covered by the forum-selection clause.

[54] *Pinto Tech. Ventures, L.P. v. Sheldon*, 526 S.W.3d 428, 444 & n.68 (Tex. 2017) (noting the transaction-participant enforcement theory, as articulated by Texas intermediate appellate courts, "is similar to the doctrine federal courts employ to bind nonsignatories to forum-selection clauses when they are 'closely related to the contractual relationship'").

[55] *Id.* (quoting *Carlile Bancshares, Inc. v. Armstrong*, Nos. 02-14-00014-CV & 02-14-00018-CV, 2014 WL 3891658, at *10 (Tex. App.—Fort Worth Aug. 7, 2014, no pet.) (mem. op.), and citing *Brock v. Entre Comput. Ctrs., Inc.*, 740 F. Supp. 428, 430-31 (E.D. Tex. 1990)).  By way of example, we described "transaction participants" as including "'an employee of one of the contracting parties who is individually named by another contracting party in a suit arising out of the contract containing the forum[-]selection clause.'" *Id.* (quoting *Accelerated Christian Educ., Inc. v. Oracle Corp.*, 925 S.W.2d 66, 75 (Tex. App.—Dallas 1996, no writ)).

[56] *Id.*

already agreed to submit contract-related disputes to a particular forum, enforcement of the forum-selection provision "comports with the 'legitimate expectations of the parties, [as] manifested in their freely negotiated agreement.'"[57] Even so, we noted at the time that "[c]ourts recognizing the validity of the [transaction-participant] enforcement theory have done so 'solely in the context of a nonsignatory defendant attempting to enforce a forum-selection clause against a signatory plaintiff . . .' and not the converse."[58]

Cadbury, Rieder, and Rapee contend the court of appeals improperly expanded the transaction-participant theory in two ways: first, by allowing nonsignatories to enforce the forum-selection clause against other nonsignatories; and second, by allowing a nonsignatory plaintiff to enforce a forum-selection clause against a signatory defendant. In their view, this particular enforcement theory may only be used defensively against a signatory plaintiff. They also contend that allowing Woods and Meeker to enforce the forum-selection clause against Rieder and Rapee would be contrary to the well-settled principle that LLC members generally cannot be held liable for the business's contractual obligations. Finally, they assert that, like *Sheldon*, a "benefits" clause in the Series Agreement expressly limits the parties who may invoke the forum-selection clause against its signatories. The "benefits" clause in the Series Agreement provides that the agreement "will be binding upon, and will inure to the benefit of, the Members and their permitted successors and assigns."

---

[57] *Id.* at 445 (quoting *Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 723 (2d Cir. 2013)).

[58] *Id.* at 444.

21

Woods counters that enforcement of forum-selection clauses under the transaction-participant theory does not turn on whether the party seeking or avoiding enforcement is a plaintiff or defendant. Similarly, Woods argues that even though no Cadbury LLC member personally signed the Series Agreement, that circumstance alone does not prevent enforcement under a transaction-participant theory. Instead, Woods contends the decisive question is whether the party against whom enforcement is sought actually participated in the underlying transaction such that it was foreseeable that the party would be bound by the forum-selection clause. Woods claims that Rieder and Rapee's involvement with the Series Agreement fits the bill.

Meeker and CQuentia largely echo Woods's arguments but add that Meeker's declaratory-judgment claims against signatory Cadbury must undoubtedly be heard in Texas per the forum-selection clause. Meeker supports his argument by asserting that his claims against Cadbury relate to whether the Series Agreement is valid, were brought in his capacity as CQuentia's representative, and fall within the forum-selection clause's "relate[d] to" language. Finally, Meeker maintains that the benefits clause in the Series Agreement does not prohibit nonsignatories from invoking the Series Agreement's forum-selection clause and is materially distinguishable from the benefits clause in the contract at issue in *Sheldon*.

Our opinion in *Sheldon* touches on the transaction-participant and closely related theories without endorsing or adopting either.[59] After reviewing the parties' written agreement in *Sheldon*, we concluded the contract's benefits clause rendered both enforcement theories inapplicable because the clause explicitly disclaimed any intent to extend the contract's "rights and remedies" to

---

[59] *Id.* at 444-45.

22

nonparties.[60] We explained that permitting the nonsignatory defendants to "enforce the forum-selection clause as 'transaction participants' would contravene the parties' expressed intent."[61] Consequently, we did not decide whether, or under what circumstances, a nonsignatory transaction participant could enforce the forum-selection clause because, in considering the benefit clause's unequivocal language, enforcement by nonsignatories "would not have been reasonably foreseeable, as the transaction-participant enforcement theory contemplates."[62]

The contract language we considered in *In re Rubiola* stands at the opposite end of the spectrum.[63] *Rubiola* involved efforts by nonsignatory plaintiffs to enforce an arbitration agreement against contract signatories.[64] We held that "parties to an arbitration agreement may grant non-signatories the right to compel arbitration and [the plaintiffs] were granted that right" by virtue of contract language specifically defining the "parties" to the agreement as including not only the signatories, but certain nonsignatories, including the plaintiffs.[65]

The Series Agreement does not expressly extend enforcement rights to nonsignatories, like the *Rubiola* contract, nor expressly preclude nonsignatory enforcement, like the *Sheldon* contract. Nevertheless, as in *Sheldon*, we need not decide whether or under what circumstances the

---

[60] *Id.* at 445 (construing a clause providing the contract would "inure to the benefit of and be binding upon, the successors, permitted assigns, legatees, distributees, legal representatives and heirs of each party and is not intended to confer upon any person, other than the parties and their permitted successors and assigns, any rights or remedies hereunder" as foreclosing enforcement of a forum-selection clause by nonparties (emphasis omitted)).

[61] *Id*.

[62] *Id*.

[63] 334 S.W.3d 220 (Tex. 2011) (orig. proceeding).

[64] *Id.* at 222-23.

[65] *Id.* at 222-23 & 225.

transaction-participant theory might apply, because enforcement by and against the nonsignatory parties was not reasonably foreseeable.

In *Sheldon*, we explained that, "[b]ecause forum-selection clauses are creatures of contract, the circumstances in which nonsignatories can be bound . . . are rare."[66] The extent to which nonsignatories may be subject to a forum-selection clause is thus determined by reference to "common principles of contract and agency law and the parties' chosen language[.]"[67] To that end, Cadbury's and CQuentia's business forms are designed to shield its members from individual liability for the company's obligations. Cadbury's members did not agree to be bound to the Series Agreement in their individual capacities, either by signature or by contract language. Nor did they agree to litigate internal disputes between Cadbury and its members in a Texas forum or even under Texas law. There is simply no basis from which to conclude that Wisconsin residents, in their individual capacities, would foresee being haled into a Texas forum, under a forum-selection clause in an agreement they did not sign, to resolve a dispute over the viability of a Nevada limited liability company and the validity of its operating agreement, both of which are governed by Nevada law.

Similarly, Meeker signed the Series Agreement only in a representative capacity; he did not make himself subject to the Series Agreement as an individual. Given the legal separateness between a limited liability company's member and the business entity itself, neither Cadbury nor its

---

[66] *Sheldon*, 526 S.W.3d at 443.

[67] *Id.* at 432.

24

members could have reasonably foreseen that Meeker would later seek to invoke the contract's benefits in his individual capacity when he was not willing to execute the contract in that capacity.[68]

Here, the only two parties and signatories to the Series Agreement—Cadbury and CQuentia—have conceded that any contract-related claims between them must be heard in their agreed forum, Tarrant County, Texas. But with respect to the claims involving nonsignatory plaintiffs and defendants, we hold the transaction-participant enforcement theory is inapplicable for want of foreseeability.[69]

### D. Unaddressed Issues

In the courts below, Woods, Meeker, and CQuentia raised additional arguments to support personal jurisdiction over Cadbury, Rieder, and Rapee. The court of appeals did not address these alternative arguments. "We have the option of either examining the points of error not considered by the court of appeals in order to determine if any of those points will support the court of appeals' judgment or remanding the cause to the court of appeals for it to pass on the unconsidered points."[70]

---

[68] To the extent Meeker's claims against Cadbury are made as CQuentia's representative—which is disputed—those claims would be subject to the parties' concession that any such "claims and controversies under or related to" the Series Agreement must be litigated in Texas. The court of appeals can consider these matters on remand under an analysis that treats the Cadbury Agreement as separate from the Series Agreement.

[69] Except as noted in footnote 68, the relation of the parties to the Series Agreement and their posture in the underlying suit can be classified as follows:

(1) Woods (nonsignatory) against Rieder and Rapee (nonsignatories) and Cadbury (signatory);

(2) Meeker (nonsignatory) against Rieder and Rapee (nonsignatories) and Cadbury (signatory); and

(3) CQuentia (signatory) against Rieder and Rapee (nonsignatories).

[70] *First Baptist Church of San Antonio v. Bexar Cty. Appraisal Review Bd.*, 833 S.W.2d 108, 111 (Tex. 1992).

25

We conclude judicial economy is best served by reversing and remanding to the court of appeals for consideration of the unaddressed points.[71]

### III. Conclusion

Forum-selection clauses are creatures of contract, the terms of which are fundamental to our analysis.[72]  In certain circumstances, courts may construe multiple documents as if they form a single, unified instrument.[73]  But this is not one of those cases.  After thoroughly analyzing the agreements at issue, we hold the court of appeals erred in construing the Cadbury Agreement and the Series Agreement as a single, unified instrument and by applying the transaction-participant enforcement theory.

The mere fact that the Cadbury Agreement and the Series Agreement bore some relationship to one another and were executed on the same day is not controlling.  The two agreements were executed by different parties, deal with separate situations, impose distinct obligations, and are governed by different law.  Furthermore, neither agreement is essential to the other, references the other, nor manifests an intent to fulfill any of the obligations in the other.  Perhaps most importantly, we are unable to glean from either agreement's express terms that they were executed as a part of the same business transaction.  To the contrary, by including a merger clause in each agreement, the parties manifested an intent that the agreements would operate independently.  Finally, Woods,

---

[71] The court of appeals did not reach the following arguments the plaintiffs' raised: (1) whether equitable estoppel prevents Rieder and Rapee from objecting to enforcement of the forum-selection clause; (2) whether Rieder and Rapee waived their special appearance as to the claims made by Meeker and CQuentia; and (3) whether Texas can exercise personal jurisdiction over Rieder and Rapee under a traditional personal-jurisdiction analysis.

[72] *See Sheldon*, 526 S.W.3d at 432.

[73] *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000).

Rieder, and Rapee's decision to form Cadbury in an effort to shield themselves from personal liability is further telling of their intent, as is the conduct of Meeker (CQuentia) and Woods (Cadbury) in signing the Series Agreement as representatives, not individuals. These liability-limiting measures would have been unnecessary had the parties intended the two agreements to constitute a single transaction. To hold otherwise would undermine the parties' intent as expressed in their agreements.[74] For these reasons, we reverse the court of appeals' judgment and remand to that court to consider the unaddressed issues.

_____

Eva M. Guzman
Justice

**OPINION DELIVERED**: June 12, 2020

---

[74] *See Americo Life, Inc. v. Myer*, 440 S.W.3d 18, 22 (Tex. 2014) ("To determine the parties' intent, we examine the express language of their agreement.").

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below:

Envelope ID: 43710781
Status as of 06/12/2020 15:29:46 PM -05:00

Associated Case Party: AnthonyA.Rieder

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Timohty J.Andringa | | tja@cmhlaw.com | 6/12/2020 3:25:24 PM | SENT |
| Kevin Smith | | ksmith@belaw.com | 6/12/2020 3:25:24 PM | SENT |
| Joseph FCleveland | | jcleveland@belaw.com | 6/12/2020 3:25:24 PM | SENT |
| Matthew M.Fernholz | | mmf@cmhlaw.com | 6/12/2020 3:25:24 PM | SENT |

Associated Case Party: Ed Rapee

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Timohty J.Andringa | | tja@cmhlaw.com | 6/12/2020 3:25:24 PM | SENT |
| Matthew M.Fernholz | | mmf@cmhlaw.com | 6/12/2020 3:25:24 PM | SENT |
| Joseph FCleveland | | jcleveland@belaw.com | 6/12/2020 3:25:24 PM | SENT |
| Kevin Smith | | ksmith@belaw.com | 6/12/2020 3:25:24 PM | SENT |

Associated Case Party: Cadbury Solutions, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Timohty J.Andringa | | tja@cmhlaw.com | 6/12/2020 3:25:24 PM | SENT |
| Matthew M.Fernholz | | mmf@cmhlaw.com | 6/12/2020 3:25:24 PM | SENT |
| Joseph FCleveland | | jcleveland@belaw.com | 6/12/2020 3:25:24 PM | SENT |
| Kevin Smith | | ksmith@belaw.com | 6/12/2020 3:25:24 PM | SENT |

Associated Case Party: Kenny Woods

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Mack Ed Swindle | 19587500 | mswindle@whitakerchalk.com | 6/12/2020 3:25:24 PM | SENT |
| Thomas F. Harkins | 9000990 | tharkins@whitakerchalk.com | 6/12/2020 3:25:24 PM | SENT |

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below:

Envelope ID: 43710781
Status as of 06/12/2020 15:29:46 PM -05:00

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Stacy Blanchette | | stacy.blanchette@kellyhart.com | 6/12/2020 3:25:24 PM | SENT |
| Ashley Roberts | | ashley.roberts@kellyhart.com | 6/12/2020 3:25:24 PM | SENT |
| Randee Rogers | | rrogers@belaw.com | 6/12/2020 3:25:24 PM | SENT |

Associated Case Party: Alan Meeker

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| William Nolan Warren | 786331 | bill.warren@kellyhart.com | 6/12/2020 3:25:24 PM | SENT |
| Caitlyn Hubbard | 24097853 | caitlyn.hubbard@kellyhart.com | 6/12/2020 3:25:24 PM | SENT |

Associated Case Party: CQuentia Series, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| William Nolan Warren | 786331 | bill.warren@kellyhart.com | 6/12/2020 3:25:24 PM | SENT |
| Caitlyn Hubbard | 24097853 | caitlyn.hubbard@kellyhart.com | 6/12/2020 3:25:24 PM | SENT |